UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE SERBIAN ORTHODOX CHURCH – SCHOOL CONGREGATION OF SAINT PETKA,<br><br>                                        Plaintiff,<br><br>v.<br><br>BROTHERHOOD MUTUAL INSURANCE COMPANY, and DOES 1–20,<br><br>                                        Defendants. | Case No.:  3:24-cv-1375-CAB-KSC<br><br>**ORDER GRANTING-IN-PART & DENYING-IN-PART MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>**[Doc. No. 28.]** |

Before the Court is Defendant Brotherhood Mutual Insurance Company's ("BMIC") motion for partial summary judgment. [Doc. No. 28.] Defendant seeks summary judgment on Plaintiff Serbian Orthodox Church – School Congregation of Saint Petka's ("St. Petka") second cause of action for breach of the implied covenant of good faith and fair dealing, and claim for punitive damages. The matter is fully briefed. [Doc. Nos. 28, 31–32.] The Court finds this matter appropriate for determination on the papers. *See* S.D. Cal. CivLR 7.1(d)(1). For the reasons below, the Court **DENIES** the motion for partial summary judgment as to the second cause of action for breach of the implied covenant of good faith and fair dealing, and **GRANTS** the motion as to the claim for punitive damages.

## I.       BACKGROUND

This case stems from an insurance claim made by Plaintiff St. Petka under a commercial ministry insurance policy issued by Defendant BMIC.  [Doc. No. 21 at 3.] That policy covered, *inter alia*, St. Petka's church building, referred to as the Sanctuary, for direct physical loss caused by a covered peril, including rain.  [*Id.*;  Doc. No. 28-1 at 6; Doc. No. 28-8 at 264.]  The relevant sections of the policy are the Broadened Building and Personal Property Coverage Part and the Interior Building Damage Coverage Endorsement. [Doc. No 28-1 at 6–8.]  The former excluded any loss caused by neglect or water leakage that continues for 14 days or more, and the latter excluded loss caused by wear and tear.  [*Id.* at 7.]

On February 1, 2023, St. Petka filed an insurance claim for water damage the Sanctuary sustained from wind and rain on January 15, 2023.  [*Id.* at 8; Doc. No. 31 at 8.] St. Petka claimed that the rain and wind caused extensive water intrusion into the Sanctuary, damaging its plaster walls and ceilings and fresco paintings.  [*Id.*]  BMIC assigned the claim to senior adjuster Patrick Hurley ("Hurley").  [*Id.* at 11.]  After initial site inspections by both St. Petka and BMIC, Hurley sent a letter discussing potential bars to coverage and requesting further information and documents from St. Petka.  [Doc. No. 28-7 at 585–94.]

Over the course of the next seventeen months, the parties exchanged additional letters and responses to no avail.  BMIC variably sought reports, documents, information, photographs, and/or videos specifically concerning (1) repairs made following a previous claim from 2017 for water damage to the parsonage (a separate building), (2) repairs made to the Sanctuary following the 2023 water damage claim, (3) GoFundMe donations given to St. Petka for repairs, and (4) efforts to protect the Sanctuary from water damage.  [*See, e.g.*, Doc. No. 28-8 at 3–5, 145–49; Doc. No. 28-7 at 592–93.]  St. Petka argues that documentation for the 2017 claim is irrelevant and that BMIC made other irrelevant requests like identities of St. Petka's GoFundMe donors and documentation for buildings other than the Sanctuary.  [Doc. No. 31 at 10.]

3:24-cv-1375-CAB-KSC

With no resolution reached, St. Petka sued on August 2, 2024 for breach of contract and breach of the implied covenant of good faith and fair dealing.  On October 8, 2025, based on photographs and videos acquired during the course of litigation and testimony by St. Petka's priest and former president, BMIC ultimately acknowledged that a portion of St. Petka's claim for water damage to the interior of the Sanctuary was covered and issued a payment of $543,711.73.  [Doc. No. 28-8 at 260–265.]  St. Petka contends, however, that BMIC's payment was both too little and too late.[1]  [Doc. No. 31 at 6.]  They argue that BMIC unreasonably delayed the claim, failed to properly investigate it, and inadequately supervised their assigned claim adjusters.  [*Id.* at 6–7.]  BMIC counters that it reasonably relied on expert opinions, St. Petka repeatedly failed to provide information necessary for claim adjudication, and that St. Petka provided inconsistent information.  [Doc. No. 28-1 at 17–25.]

### A.    Timeline of the Claim

### i.    Initial Correspondence and Investigations

On January 15, 2023, the Sanctuary's interior was damaged after a heavy wind and rain storm.  St. Petka hired David Melzer ("Melzer"), a public adjuster, to assess the damage and assist with their policy claim.  On February 1, 2023, St. Petka filed its claim, and Melzer interviewed St. Petka's priest and former president who both stated they had seen water raining down in the Sanctuary amid a heavy rain and windstorm.  [Doc. No. 31 at 8.]  Melzer himself also observed water damage on the domes, ceiling surfaces, and fresco in the Sanctuary, and ultimately determined it was due to the reported event.  [*Id* at 8, 10.]  Meanwhile, BMIC assigned the claim on their end to senior desk adjuster Patrick Hurley ("Hurley").  [Doc. No. 31 at 10.]

On February 14, 2023, Robert Wahnon ("Wahnon"), BMIC's assigned field adjuster, inspected St. Petka' property.  Wahnon noted interior damage to the Sanctuary

---

[1] St. Petka claims approximately $926,000 in interior Sanctuary damage, exclusive of attorney fees and costs, statutory interest, and any damages recoverable for bad faith.  [Doc. No. 31 at 6.]

3:24-cv-1375-CAB-KSC

that may have been due to long-term water damage and "water stains that may have happened multiple times" as opposed to solely from the reported event. [Doc. No. 28-7 at 19.] BMIC subsequently retained Doru Botic ("Botic"), a forensic engineer, who inspected the property, confirmed water damage to the interior of the Sanctuary, noted there were signs of long-term water intrusion in the Sanctuary's attic, and concluded that the roof was damaged prior to the reported event. [*Id.* at 540–44.]

On March 1, 2023, BMIC also retained Paul Nilles ("Nilles"), a construction consultant, who in turn retained Joe LoBasso ("LoBasso"), a forensics consultant, to determine the extent of moisture damage to the dome of the Sanctuary. On March 13, 2023, LoBasso inspected the Sanctuary with Melzer present and concluded that moisture damage to the lower section of the dome was indicative of long-term moisture intrusion. [*Id.* at 522, 529.] On March 20, 2023, Melzer submitted photographs from October 2022 to LoBasso and BMIC, which Melzer described as "showing the ceiling in pristine condition" and would thus contradict LoBasso's opinion. [*Id.* at 569; Doc. No. 31 at 9–10.]

On March 21, 2023, Melzer submitted St. Petka's proof of loss to BMIC with the reported date of loss of January 15, 2023 crossed out and replaced with a handwritten January 1, 2023. [Doc. No. 28-7 at 577.] On April 24, 2023, Melzer sent a notice of demand to BMIC noting that BMIC had issued no payment, status letter, or reservation of rights, and requesting all photos and reports by BMIC's adjusters and vendors. [*Id.* at 581.]

### ii.  BMIC Requests Additional Information

On April 25, 2023, BMIC sent Melzer a reservation of rights letter, which (1) stated the investigation was ongoing, (2) outlined the facts BMIC knew based on the aforementioned inspections, (3) highlighted possible coverage exclusions based on the inspections, and (4) requested information and documents related to a prior 2017 claim, any preventative water intrusion measures and repairs made following the 2017 claim, any work done on the Sanctuary in February 2023, and an accounting of donations made to St. Petka for repairs. [*Id.* at 585–94.]

On May 8, 2023, Hurley sent Melzer a letter acknowledging Melzer's April 24 letter and stating that the investigation was ongoing and that BMIC would provide Melzer with required photos and reports by May 24, 2023. [*Id.* at 596.] On June 2, 2023, Hurley sent Melzer certain photos and reports and reiterated BMIC's request for the previously requested information and documents. [*Id.* at 598.]

### iii.  St. Petka Retains Counsel and a Forensics Firm

St. Petka eventually retained counsel and on July 14, 2023, attorney Erika Alba ("Alba") sent a notice of representation to BMIC. [Doc. No. 28-7 at 600.] Alba requested the insurance policy, any coverage determinations, and that all further communications be directed through her. [*Id.*] On July 25, 2023, Hurley acknowledged Alba's letter, sent the policy, and informed her that BMIC had not completed its investigation because St. Petka had not provided the information requested in previous letters. [Doc. No. 28-8 at 3.] On September 8, 2023, Hurley followed up on the July 25, 2023 letter and again sought the requested information. [*Id.* at 7.]

On December 6, 2023, Alba sent Hurley a letter seeking reevaluation of BMIC's coverage determination[2] for only the interior of the Sanctuary, specifically the plaster walls, ceiling, fresco, and light fixtures—not the roof.[3] [*Id.* at 9–10.] She also argued that St. Petka's 2017 claim concerned damage in a different building than the 2023 claim and, if BMIC disagreed, requested all information on the 2017 claim that BMIC had. [*Id.*] Finally, Alba stated that St. Petka retained Forensic Building Science ("FBS") to inspect the Sanctuary's damage and included FBS's report which found that the damage to the Sanctuary was consistent with a wind and rain event that occurred on January 15, 2023 and was not pre-existing water damage. [*Id.* at 10, 14.]

---

[2] Alba mentioned that Hurley's September 8 letter denied coverage, however nothing in the letter suggested that BMIC had made a final decision.

[3] St. Petka's initial claim also sought coverage for the parsonage, which was a separate building on the Church's property. The parties make clear that only coverage for the Sanctuary is at issue in this litigation.

3:24-cv-1375-CAB-KSC

On January 15, 2024, Hurley replied to Alba's December 6 letter that BMIC was investigating the FBS report and that St. Petka still had not provided the information and documentation BMIC previously requested. [*Id.* at 143.] On May 6, 2024, Hurley followed up and told Alba and Melzer that the December 6 letter and FBS report provided some but not all of the information and documentation that BMIC was seeking. [Doc. No. 28-8 at 145.] Moreover, based on new facts raised by the December 6 letter and report, Hurley made additional requests including 100 pre-claim photos from October 2022 that St. Petka had provided to FBS and information concerning a tarp on the Sanctuary's roof that was meant to protect the interior. [*Id.* at 146–49.] Hurley also noted that his September 8 letter did not deny coverage as Alba had suggested but only followed up on the requests for information. [*Id.* at 146.]

On May 29, 2024, BMIC sent a letter to Melzer in response to a complaint he filed on May 3, 2024 with the California Department of Insurance over BMIC not providing certain documentation. BMIC argued that part of the information that Melzer sought was from the previous 2017 claim, which BMIC was no longer required to maintain, and that the information for the 2023 claim was provided. [*Id.* at 151–52.]

On June 13, 2024, Alba replied to Hurley's May 6 letter and addressed every question and request made. [Doc. No. 28-8 at 155–59.] She explained, *inter alia*, how the light fixtures and fresco sustained damage, that seal ice and water guards—not a tarp—was actually used to protect the roof, the 2017 claim concerned damage to the "Hall" while the 2023 claim concerned damage to the "Church", the GoFundMe donations were to offset funds lost due to COVID shutdowns not for repairs. [*Id.*] Alba also provided the 100 pre-claim photographs from October 2022 and hundreds of documents relating to repairs made following the 2017 claim. [*Id.*]

On July 3, 2024, Hurley acknowledged the June 13, 2024 letter and stated again that BMIC needed all photographs and videos of the church building before the claimed date of loss. [Doc. No. 28-8 at 161.] Moreover, Hurley stated that BMIC understood that the

2017 claim did not involve the church building, but it did involve the parsonage. However, St. Petka withdrew the 2023 claim relating to the parsonage seven months earlier.

### iv.  St. Petka Files Suit

On August 2, 2024, St. Petka filed this lawsuit. In October 2024, Peter Kujak ("Kujak"), a BMIC senior manager and Hurley's supervisor, placed Hurley on limited duties because he was having trouble getting things completed properly and timely. [Doc. No. 31-2 at 134–35.] In November 2024, Kujak was assigned to St. Petka's claim. [*Id.* at 17.] In December 2024, Hurley was fired because of diminished mental capacity. [*Id.* at 133.] On January 9, 2025, Kujak sent Alba a letter once again summarizing the claim, relevant known facts, and status of the ongoing investigation. [Doc. No. 28-8 at 221–28.]

In August 2025, St. Petka produced additional photographs and videos and a revised estimate from FBS that excluded damage that St. Petka's presidents said was never meant to be part of the claim. [Doc. No. 28-1 at 14.] That month, BMIC also retained Todd Martin ("Martin"), a forensics consultant, to evaluate the information BMIC had obtained so far. [Doc. No. 28-1 at 20.] Martin concluded that the "moisture-related interior finish distress at the [Sanctuary] was primarily the result of removed/missing metal panel roofing over an extended period of time, in conjunction with multiple storm events." [Doc. No. 28-8 at 338.]

On October 8, 2025, Kujak sent Alba a coverage explanation letter and a check for $543,711.73. [Doc. No. 28-8 at 260–65.] Kujak explained that BMIC agreed to pay for the interior water damage to the Sanctuary caused by rain on January 15, 2023 based on: (1) testimony from St. Petka's presidents that they saw water seeping through the fresco and that the GoFundMe for roof repairs related to the main entrance which was not supposed to be part of the claim, (2) the updated FBS estimate which removed the main entrance from the total amount sought, and (3) the photographs and videos produced in August 2025. [*Id.* at 265.] Regarding the photographs and videos, Kujak stated that though they were not time stamped, BMIC understood from a St. Petka president's testimony that

they were taken immediately after the leak was discovered and that they show a large amount of rain entering the Sanctuary.  [*Id.*]

## II.   LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is material only if it could affect the outcome of the case under governing law.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A factual dispute is "genuine" when it could "lead a rational trier of fact to find for the non-moving party[.]"  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The moving party bears the initial burden of identifying relevant portions of the record that demonstrate the absence of a fact or facts necessary for one or more essential elements of each claim upon which the moving party seeks judgment.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Where the moving party meets its initial burden, the opposing party must then set out specific facts showing a genuine issue for trial to defeat the motion.  *Anderson*, 477 U.S. at 248.  Reasonable inferences must be drawn in the nonmoving party's favor, but such inferences are limited to those upon which a reasonable jury might return a verdict.  *U.S. ex. rel. Anderson v. N. Telecom, Inc.*, 52 F.3d 810, 815 (9th Cir. 1995).

## III.   DISCUSSION

BMIC asserts that it did not breach the implied covenant of good faith and fair dealing, or act in bad faith, because there was a genuine dispute as to whether St. Petka's claim was covered.  [Doc. No. 28-1 at 5.]  St. Petka counters that the record shows unreasonable conduct by BMIC which creates a triable issue of fact for a jury.  [Doc. No. 31 at 5.]

### A.   California Law

To establish a breach of the implied covenant of good faith and fair dealing, an insured must establish that (1) benefits due under the policy were withheld, and (2) the reason for withholding benefits was unreasonable or without proper cause.  *Love v. Fire*

3:24-cv-1375-CAB-KSC

*Ins. Exch.*, 221 Cal.App.3d 1136, 1151 (1990). "While an erroneous denial of a claim may constitute a breach of contract, it does not by itself support tort liability." *LG Infocomm U.S.A., Inc. v. Euler Am. Credit Indem. Co.*, 419 F.Supp.2d 1248, 1254 (S.D. Cal. 2005). Rather, tort liability will result "[w]hen the insurer unreasonably and in bad faith withholds payment of the claim of its insured." *Frommoethelydo v. Fire Ins. Exch.*, 42 Cal.3d 208, 214–215 (1986).

However, the "genuine-dispute doctrine is an affirmative defense to a bad-faith claim. Under the doctrine, 'an insurer denying or delaying the payment of policy benefits due to the existence of a genuine dispute with its insured as to the existence of coverage liability or the amount of the insured's coverage claim is not liable in bad faith even though it might be liable for breach of contract.'" *Fed. Ins. Co. v. Tungsten Heavy Powder & Parts, Inc.*, 654 F.Supp.3d 1086, 1109 (S.D. Cal. 2023) (quoting *Wilson v. 21st Century Ins. Co.*, 42 Cal.4th 713, 723 (2007)). "In evaluating whether an insurer acted in bad faith, the critical issue is the reasonableness of the insurer's conduct under the facts of the particular case." *McGranahan v. GEICO Indem. Co.*, 714 F.Supp.3d 1187, 1194 (C.D. Cal. 2024) (citing *Pinto v. Farmers Ins. Exch.*, 61 Cal.App.5th 676, 786 (2021)).

Neither party has moved for summary judgment on the breach of contract claim. As such, there remains a question of material fact as to whether benefits due under the policy were withheld and/or delayed—the first prong of the bad faith claim. Acknowledging this awkward posture, other courts have elected to focus on the second prong and whether the withholding of benefits due, if any, was reasonable. *See Bravo v. U.S. Life Ins. Co. in City of N.Y.*, 701 F.Supp.2d 1145, 1159 (E.D. Cal. 2010) ("[B]ecause there is a material question regarding breach of contract, there is necessarily also a material question as to whether benefits due were withheld. The court therefore looks to whether defendant is entitled to summary judgment on the issue of reasonableness.); *Schafer v. Allstate Ins. Co.*, No. S-08-827-LKK-DAD, 2009 WL 1505302, at *7 (E.D. Cal. May 27, 2009) (similar). Accordingly, the Court elects to do the same here.

3:24-cv-1375-CAB-KSC

### B.    Reasonableness of BMIC's Conduct

#### i.    BMIC's Initial Burden

The Court finds that BMIC carries its initial burden to show that its handling of St. Petka's claim was reasonable.  BMIC highlights three bases in the record: (1) reliance on expert opinions that the claimed damage was due to long-term water intrusion which the policy did not cover, (2) St. Petka not providing all requested information, and (3) inconsistencies in the information that St. Petka did provide.  [Doc. No. 28-1 at 17.]

#### 1.    Expert Opinions

A court may find that bad faith does not exist where "an insurer relies on the advice and opinions of experts to deny or delay payment of a claim." *Cosmero v. State Farm Mut. Auto. Ins. Co.*, No. CIVS-06-CV-276-DFL-KJM, 2007 WL 1345473, at *3 (E.D. Cal. May 8, 2007), *as amended* (May 15, 2007) (citing *Chateau Chamberay Homeowners Ass'n v. Associated Int'l Ins. Co.*, 90 Cal.App.4th 335, 348 (2001)).

BMIC notes that it retained four independent forensic consultants—Botic, LoBasso, Nilles, and Martin—to assist with investigating the claim.  Botic inspected the Sanctuary and concluded that the Sanctuary's roof was damaged prior to January 15, 2023 based on "advanced degradation of the roof sheathing and dry rot (plywood board perforations)." [Doc. No. 28-7 at 540.]  LoBasso evaluated the Sanctuary's main dome and concluded that moisture stains within it were due to "long-term and repeated exposure to moisture intrusion." [*Id.* at 531.]  Nilles compared pre- and post-January 15, 2023 photographs, which he found suggested that the Sanctuary "is experiencing ongoing water infiltration dating back to if not before 2022." [Doc. No. 28-8 at 350.]  Finally, Martin analyzed photos and a site evaluation report and concluded that some moisture damage in the Sanctuary was due to multiple storm events that occurred over an extended period of time rather than just the January 15, 2023 event.  [*Id.* at 338.]

These expert opinions suggest at least some of the claimed water damage may have resulted from excludable causes.  *See Brackett v. Travelers Prop. Cas. Co. of Am.*, No. 2:23-CV-555-DJC-AC, 2025 WL 1549033, at *6 (E.D. Cal. May 30, 2025) ("As courts

have found, genuine disputes exist where denial or delay of a claim [was] based on expert opinion.").

### 2.      Further Information Needed

"[T]here can be no unreasonable delay 'until the insurer receives adequate information to process the claim and reach an agreement with the insureds.'" *Id.* at *4 (quoting *Globe Indemn. Co., v. Superior Court,* 6 Cal.App.4th 725, 732 (1992)).  BMIC sought varying information and documents, including photos of the Sanctuary from before the claim date, through approximately nine letters sent to St. Petka between April 2023 and January 2025.  BMIC claims that this information was needed to adjudicate the claim, and that once it received it through the discovery process, it completed its investigation and issued the coverage decision and payment.

### 3.      Inconsistencies

Finally, BMIC argues there were three inconsistencies in St. Petka's claim. California courts have found no bad faith where the insured's claim had "material misrepresentations and several inconsistencies[.]"  *Hodjat v. State Farm Mut. Auto. Ins. Co.*, 211 Cal.App.4th 1, 9 (2012).

First, St. Petka changed the date of the claim on its proof of loss from January 15 to January 1, 2023, which meant damage on January 15, 2023 may have been excluded from coverage, before changing it back to January 15 in letters that Alba sent.  Second, St. Petka changed the reported cause of loss from wind that damaged the roof, to wind that blew off a tarp, to water penetrating or wind blowing off ice/water guards that led to water intrusion into the Sanctuary.  And third, BMIC highlights that Melzer initially claimed photographs from October 2022 showed the ceiling in pristine condition despite the fact that the FBS report depicted prior water stains from 2022, as well as other October 2022 photos that BMIC received during discovery.  [Doc. No. 28-1 at 25.]

In total, the aforementioned evidence identified by BMIC suffices to carry its burden of production and "negat[e] an essential element of [St. Petka's] claim[.]"  *Jones v. Williams*, 791 F.3d 1023, 1030–31 (9th Cir. 2015).  Accordingly, the burden now shifts to

St. Petka to set out specific facts showing there is a genuine issue as to the reasonableness of BMIC's conduct.

### ii.    St. Petka's Burden

St. Petka argues that a jury could find BMIC's handling of the claim was unreasonable based on, *inter alia*, evidence that BMIC's investigation was inadequate and that it did not need information that it repeatedly sought from St. Petka.  The Court agrees.

### 1.    Inadequate Investigation

St. Petka contends that BMIC's investigation of the claim was inadequate because BMIC could have sought testimonies it relied on to adjudicate the claim far earlier, Hurley was an incompetent adjuster, and Kujak neglected St. Petka's claim.

"[I]t is essential that an insurer fully inquire into possible bases that might support the insured's claim." *Egan v. Mut. of Omaha Ins. Co.*, 24 Cal.3d 809, 819 (1979).  An insurer's investigation is unreasonable where it "fails to consider, or seeks to even discover," relevant evidence.  *Duitch v. Travelers Ins. Co.*, No. 16-CV-5625-PSG-JCX, 2017 WL 3579695, at *5 (C.D. Cal. Aug. 1, 2017) (citing *Mariscal v. Old Republic Life Ins. Co.*, 42 Cal. App. 4th 1617, 1624 (1996)).  Indeed, "an insurer is not entitled to summary judgment if a reasonable jury could conclude that the insurer acted unreasonably, and thus in bad faith, by failing to fully inquire into possible bases that might support the insured's claim." *Id.* at *6.  "[T]he reasonableness of an insurer's claims-handling conduct is ordinarily a question of fact."  *Amadeo v. Principal Mut. Life Ins. Co.*, 290 F.3d 1152, 1161 (9th Cir. 2002) (citations and quotation marks omitted) (alteration in original).

In his October 8, 2025 letter, Kujak stated that BMIC found coverage for St. Petka's claim based in part on testimony from St. Petka officials that they saw water enter the building on January 15, 2023, and seep through the fresco.  [Doc. No. 28-8 at 265.] Although the claim was initially filed in February 2023, the officials' depositions did not take place until May 2025, [Doc. No. 28-10 at 191, 207], and July 2025, [Doc. No. 31-2 at 77].  St. Petka officials had highly relevant information from the beginning—as evidenced by the coverage decision partially resting upon what they shared—and that fact should have

3:24-cv-1375-CAB-KSC

been obvious to BMIC.  A jury could find BMIC unreasonably delayed the claim by not seeking and considering testimony from these officials earlier.

St. Petka also takes issues with the adjusters assigned to their claim.  They argue that Hurley was an incompetent adjuster and BMIC failed to supervise him.  To begin, they note that Hurley failed to complete a required status report on St. Petka's claim until over a year from when it was initially due. [Doc. No. 31 at 11.]  Hurley also repeatedly sought information on the 2017 claim, which concerned the parsonage, and not the Sanctuary, well after St. Petka withdrew its claim for coverage for the parsonage.  St. Petka argues that BMIC was on notice of Hurley's performance issues long before he was terminated but failed to supervise him or take earlier action.  For example, BMIC received between 10–20 complaints about Hurley from other customers from approximately February 2024 through November 2024.  He suffered memory loss from a stroke in August 2024, was placed on limited duties in October 2024, and fired in November 2024 for performance issues.

Additionally, St. Petka asserts that Kujak—Hurley's replacement—neglected the claim after being assigned to it in November 2024.  Kujak states that until he prepared for his deposition in this case on May 29, 2025, all he did was speak with Wahnon and Nilles for a brief status update in November 2024 and review the January 2025 letter that BMIC sent to St. Petka. [Doc. No. 31-2 at 16.]  Kujak did not read the policy-at-issue, the FBS report, or any of the forensic consultants' reports until he prepared for his deposition in this case on May 29, 2025. [Doc. No. 31 at 13–14.]  Nor did Kujak ever discuss the reports with any of their authors.  St. Petka argues that effectively no BMIC adjuster was working on St. Petka's claim from November 2024 until May 2025.

BMIC replies that (1) St. Petka ignores the January 2025 letter sent by Kujak, (2) other BMIC employees were investigating the claim, and (3) after the lawsuit was filed BMIC had to conduct its investigation through counsel via formal discovery. [Doc. No. 32.]  Though Kujak did sign the January 2025 letter, his deposition indicates he only reviewed the letter before it was sent—implying he did not write it. [Doc. No. 31-2 at 16.]

13

3:24-cv-1375-CAB-KSC

BMIC also does not explain what any other BMIC employee was doing on the claim. Further, even if other BMIC personnel were involved and if BMIC had to conduct further investigation through counsel, BMIC concedes that Kujak, as the adjuster, was still the only one who could make all final coverage decisions. [Doc. No. 28-6 at 7.]

### 2.     BMIC Seeks Unnecessary Documentation

Another stated basis for coverage in Kujak's October 8, 2025 letter was that BMIC finally received long-sought photos and videos from St. Petka on August 19, 2025. Throughout the investigation, BMIC repeatedly requested photographs and videos of the Sanctuary from before January 15, 2023. [Doc. No. 28-8 at 262.] Indeed, St. Petka's purported failure to provide pre-loss documentation is one of the major bases upon which BMIC's argument for reasonableness rests. BMIC, however, ultimately did not need every photograph and video from before the loss date to find coverage.

In the October 8, 2025 letter, Kujak acknowledged that the photographs and videos provided by St. Petka on August 19, 2025 were not time stamped, but that BMIC understood that they were taken immediately after the water intrusion on the loss date based on testimony by former St. Petka president. Thus, BMIC was able to reach its coverage decision without having photographs and videos that pre-dated the loss date. *See Chalal v. United Fin. Cas. Co.*, No. 2:25-CV-00037-TLN-SCR, 2025 WL 2779769, at *4 (E.D. Cal. Sept. 30, 2025) ("While there can be no unreasonable delay until the insurer receives sufficient information to process a claim, there may be unreasonable delay when an insurer is in receipt of sufficient information to render a coverage determination." (internal citation and quotation marks omitted)).

However, even if BMIC received photographs and videos on August 19, 2025 that were pre-loss, and relied on them, St. Petka had already provided 100 pre-loss photographs from October 2022 earlier on June 13, 2024, in response to a request by Hurley. [Doc. No. 28-8 at 158–59.] Hurley confirmed receipt of the pre-loss photographs in a follow-up letter but again simply reiterated a request for all pre-loss photographs and videos. Neither Hurley then, nor BMIC now, explained how those 100 pre-loss photographs were

insufficient or what BMIC needed to see in additional pre-loss photographs/videos to adjudicate the claim. Moreover, St. Petka flags in its opposition that it sent four, 2022 pre-loss photographs of the Sanctuary's interior to Hurley and BMIC *even earlier* on March 20, 2023, which it argued showed the ceiling in pristine condition. Although BMIC now argues that other photographs they acquired later show prior water stains within the interior of dome, during the investigation of the claim they did not acknowledge nor appear to investigate or follow up on those four pre-loss photographs. *See Mariscal*, 42 Cal.App.4th at 1623 ("A trier of fact may find that an insurer acted unreasonably if the insurer ignores evidence available to it which supports the claim. The insurer may not just focus on those facts which justify denial of the claim.").

Ultimately, the Court finds that St. Petka carries its burden to show that there is a genuine issue as to whether BMIC's handling of St. Petka's claim was reasonable. Indeed, St. Petka has sufficiently shown that a jury could conclude BMIC's conduct was unreasonable based on the totality of the evidence, which includes failing to seek crucial information earlier, Hurley's and Kujak's performances as adjusters, and BMIC delaying adjudication because it purportedly required all pre-loss photographs/videos when it eventually found coverage without relying on them and was already provided over 100 pre-loss photographs. *See Shade Foods, Inc. v. Innovative Prod. Sales & Mktg., Inc.*, 78 Cal.App.4th 847, 879 (2000) ("Among the most critical factors bearing on the insurer's good faith is the adequacy of its investigation of the claim.").

### C.   Punitive Damages

BMIC argues that even if the Court denies summary judgment as to the bad faith cause of action, punitive damages are not warranted. The Court agrees.

"[T]he evidence required to support an award of punitive damages for breach of the implied covenant of good faith and fair dealing is 'of a different dimension' from that needed to support a finding of bad faith. A marginally sufficient case of bad faith is not likely to prove malice or oppression by clear and convincing evidence." *Id.* at 909–10.

3:24-cv-1375-CAB-KSC

The evidence St. Petka relies on in support of punitive damages is the same which it relied on for its bad faith argument.  That evidence is insufficient; BMIC's conduct simply cannot "be described as evil, criminal, recklessly indifferent to the rights of [St. Petka], or with a vexatious intention to injure." *Tomaselli v. Transamerica Ins. Co.*, 25 Cal.App.4th 1269, 1288 (1994).  Accordingly, the Court **GRANTS** summary judgment on the issue of punitive damages and **DISMISSES** the claim.

## IV.    CONCLUSION

For the reasons above, the Court finds that there is a genuine dispute as to whether BMIC's handling of St. Petka's insurance claim was reasonable.  Accordingly, the Court **DENIES** the motion for partial summary judgment as to the claim for breach of the covenant of good faith and fair dealing.  Regarding punitive damages, the Court **GRANTS** summary judgment.

It is **SO ORDERED**.

Dated:  March 19, 2026

Hon. Cathy Ann Bencivengo
United States District Judge

3:24-cv-1375-CAB-KSC